## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COREY GIBBS, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 25-2810 |
| CITY OF PHILADELPHIA, et al., | |
| *Defendants.* | |

**Pappert, J.**                                                      **September 9, 2025**

### MEMORANDUM

Corey Gibbs's 2013 convictions for first-degree murder and related firearm offenses were vacated in December 2024 after two detectives involved in his case, Philip Nordo and Ronald Dove, were convicted of numerous job-related crimes. All charges against Gibbs were subsequently dropped. Gibbs now sues Nordo, Dove and seven detectives—James Burns, John Harkins, Tracy Byard, Thorsten Lucke, Ohmarr Jenkins, John Verrecchio and Thomas Gaul—under 42 U.S.C. § 1983 and state law for violations of his civil rights and conspiracy to violate his civil rights. He also asserts a *Monell* claim against the City of Philadelphia.

Byard, Lucke, Jenkins, Verrecchio and Gaul move to dismiss all claims against them.[1] The Court grants the motion, dismissing some of the claims with prejudice and others with leave to amend.

---

[1] Gibbs asserts claims under federal and state law against all individual detectives for fabrication of evidence, malicious prosecution, failure to intervene, *Brady* violations, civil conspiracy and intentional infliction of emotional distress. The detectives move to dismiss "the claims asserted against them." (Mot. to Dismiss at 2, Dkt. No. 8.) The brief in support of their motion, however, focuses on the specific claims under federal and state law for fabrication of evidence, malicious prosecution, failure to intervene and intentional infliction of emotional distress. It does not articulate the reasons supporting dismissal of the *Brady* and civil conspiracy claims, an omission

I

Shortly after midnight on March 10, 2012, Robert Alvin and Michael Butler were shot and killed outside a bar in North Philadelphia. (Compl. ¶ 17, Dkt. No. 1.) As Philadelphia detectives investigated the killings, they interviewed three key witnesses—Valencia Thrones, Mark Holmes and Derrick Andrews—each of whom implicated Gibbs but later testified at trial that he or she did not see the shooter. (*Id.* ¶¶ 27–33, 42–53, 54–59, 100.) Gibbs alleges, however, that Thrones, Holmes and Andrews were coerced into falsely implicating him and that the prosecution's case depended on their fabricated statements. (*Id.* ¶ 100, 116.)

Thrones was interviewed by Dove and Burns four days after the murders. (*Id.* ¶ 28.) During the interview, Thrones "repeatedly" told the detectives that she did not see who shot and killed Alvin and Butler. (*Id.* ¶ 30.) Yet at some point she "capitulated" and "signed a statement implicating" Gibbs. (*Id.*) Thrones would testify at trial that she did not see Gibbs shoot and kill Alvin and Butler. (*Id.* ¶ 31–32.) She told the jury she had initially implicated Gibbs "because [she] wanted to go home" and "it wasn't [her] situation." (*Id.* ¶ 32.)

Holmes was interviewed on at least two separate occasions. (*Id.* ¶¶ 42–53.) A "white" detective interviewed Holmes shortly after the murders. (*Id.* ¶ 43.) During this interview, the detective told Holmes that Gibbs was the shooter. (*Id.* ¶ 45.) Holmes

---

Gibbs fails to address in his response. In any event, the Court assesses on the merits all claims against the detectives, including the claims for *Brady* violations and civil conspiracy, which Gibbs will be allowed to amend.

The detectives also move to dismiss "all 'official capacity' claims" against them. (Defs.' Mem. of L. in Supp. of their Mot. to Dismiss at 5, Dkt. No. 8.) Gibbs sued all nine detectives in their personal and official capacities. (Compl. ¶¶ 6–14, Dkt. No. 1.) He now "stipulates to the dismissal of all official capacity claims against Defendants Byard, Lucke, Jenkins, Verrecchio, and Gaul." (Pl.'s Mem. of L. in Opp'n to Mot. to Dismiss at 1, Dkt. No. 19.) The Court thus dismisses those claims with prejudice.

replied that Gibbs couldn't have been the shooter because Gibbs was in the bar at the time of the killings.  (*Id.*)  Nordo interviewed Holmes sometime later and allegedly pressured Holmes to identify Gibbs as the shooter, promising him a job in exchange for a statement implicating Gibbs.  (*Id.* ¶¶ 47–48.)  Holmes maintained that he did not see who killed Alvin and Butler.  (*Id.* ¶ 49.)  Sometime later, Holmes "signed [a] statement implicating [Gibbs] only because of the pressure from Defendants and because he wanted to be released."  (*Id.* ¶ 53.)

Andrews was interviewed by Nordo and Lucke several months after the murders.  (*Id.* ¶ 55.)  During the interview, Andrews told Nordo and Lucke that he did not see Gibbs with a gun on the night of the murders.  (*Id.* ¶ 57.)  Yet he eventually signed a statement that he saw Gibbs ride away from the murders on a bike carrying a firearm.  (*Id.* ¶¶ 55–56.)  But he testified at trial that he did not actually see Gibbs holding a gun near the scene.  (*Id.* ¶ 57.)  He signed his statement, he said, because he "got tired" of Nordo and Lucke "asking" him questions "about the crime scene," so he "just started to agree and stuff."  (*Id.* ¶ 58.)

In addition to Thrones, Holmes and Andrews, detectives spoke with four other individuals during their investigation—Denise Jackson, Rhonda Alvin, Talley Jacobs and Shyheed Johnson.

Jackson was interviewed a few months after the murders.  (*Id.* ¶ 36.)  At trial, she testified that detectives kept "trying to make [her] say that [Gibbs] shot the guy, that he was the shooter."  (*Id.* ¶ 37.)  They "repeatedly" showed her a photograph of Gibbs telling her that she "knew something."  (*Id.* ¶ 38.)  Despite the pressure, Jackson never implicated Gibbs.  (*Id.* ¶ 37.)

Rhonda Alvin—victim Robert Alvin's sister—spoke with detectives[2] sometime during the investigation.  (*Id.* ¶¶ 60–63.)  She told them she did not believe Gibbs had killed her brother.  (*Id.* ¶ 61.)  She thought two people, Talley Jacobs and Shyheed Johnson, were the killers.  (*Id.*)  According to Gibbs, the police neither documented this information nor disclosed it to his counsel.  (*Id.* ¶ 63.)

Jacobs and Johnson, the individuals identified by Rhonda Alvin as the shooters, were interviewed several months after the murders.  (*Id.* ¶¶ 65–66.)  Byard and Jenkins interviewed Jacobs, while Verrecchio and Gaul interviewed Johnson.  (*Id.*)  Johnson signed a statement implicating Gibbs, but did not testify at trial.  (*Id.* ¶ 66.)

Gibbs was tried for killing Alvin and Butler in September 2013.  (*Id.* ¶ 98.)  He alleges that the prosecution's case depended "entirely" on the statements coerced from Thrones, Holmes and Andrews.  (*Id.* ¶ 100.)  Though Thrones, Holmes and Andrews testified at trial that they did not actually see Gibbs shoot and kill Alvin and Butler, the prosecution emphasized during closing arguments that "what they [initially] told the detectives was true."  (*Id.* ¶¶ 99, 101.)  The jury ultimately convicted Gibbs of two counts of first-degree murder and related firearm offenses.  (*Id.* ¶ 98.)  Years later, the Conviction Integrity Unit in the Philadelphia District Attorney's Office reviewed the case and determined that Gibbs had raised "meritorious" claims in post-conviction proceedings "sounding in [the] coercion of witnesses and *Brady*."  (*Id.* ¶ 106.)  Following

---

[2]    In his brief opposing the detectives' motion to dismiss, Gibbs quotes Paragraph 19 of his Complaint as stating that "Nordo and Jenkins interviewed Rhonda Alvin, victim Rebo Alvin's sister, on July 3, 2012."  (Pl.'s Mem. of L. in Opp'n to Mot. to Dismiss at 4, Dkt. No. 19).  Paragraph 19 of the Complaint, however, describes the killing of victim Robert Alvin: "Alvin sustained gunshot wounds to his left arm, one of which perforated his arm and re-entered his chest.  He ran after being shot but fell on the corner of 17th and Susquehanna.  He was also pronounced dead at the scene."  (Compl. ¶ 19.)  Moreover, the Complaint does not allege that Nordo and Jenkins interviewed Rhonda Alvin.  It alleges that Rhonda Alvin spoke with "Defendants" in the collective sometime after the murders.  (*Id.* ¶¶ 61–62.)

this finding, in December 2024, a Pennsylvania state court vacated Gibbs's convictions. (*Id.* ¶ 108.)  All charges against him were subsequently dropped.  (*Id.*)

Gibbs now asserts claims under § 1983 and state law against the nine detectives involved in his case for fabrication of evidence, malicious prosecution, *Brady* violations, failure to intervene, civil conspiracy and intentional infliction of emotional distress. (*Id.* ¶¶ 110–57).  He also asserts a supervisory liability claim against Dove, as well as a *Monell* claim against the City of Philadelphia, alleging it had policies or customs of coercing witnesses, failing to properly document witness interviews, withholding exculpatory evidence and failing to properly train officers.  (*Id.* ¶¶ 132–44.)

## II

The Court assesses the sufficiency of a pleading before discovery under Federal Civil Rules 8 and 12.  Rule 8(a)(2) provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  And Rule 12(b)(6) permits a district court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  *Id.* 12(b)(6).  Taken together, the two rules require the plaintiff to allege sufficient "facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The first step in determining whether a plaintiff has stated a plausible claim is to "tak[e] note of the elements" underlying his claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129–30 (3d Cir. 2010).  The next step is to examine the plaintiff's complaint and determine whether the factual allegations "plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

Plausibility requires the plaintiff to plead sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The reasonableness of an inference depends on common sense and the strength of competing explanations for the defendant's conduct. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786–87 (3d Cir. 2016); *Iqbal*, 556 U.S. at 681–82. Plaintiffs do not meet the plausibility burden when the facts alleged are "merely consistent with a defendant's liability" or show nothing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted). And in gauging the plausibility of a claim, the Court must accept as true all well-pleaded factual allegations, construe those facts in the light most favorable to the plaintiff, and draw reasonable inferences from them. *Connelly*, 809 F.3d at 786 n.2.

III

Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. In judging the sufficiency of a § 1983 pleading, the Court must first identify the "exact contours of the underlying right" and determine whether the plaintiff "has alleged a deprivation" of that right. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (quotation marks and citation omitted). The Court must then determine whether the plaintiff has alleged the defendant's "personal involvement in the alleged wrongs." *Id.* (quotation marks and citation omitted). A plaintiff must plead each defendant's involvement with "appropriate particularity" to ensure that government officials are

6

held liable only for their own misconduct. *Scheing v. Foundation*, 729 F. App'x 175, 178 (3d Cir. 2018) (quotation marks and citation omitted).

In addition, qualified immunity shields a government official from civil liability (even litigation) so long as he did not "violate clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). To determine the doctrine's applicability, a court must ascertain whether the facts shown by the plaintiff "make out a violation of a constitutional right" and whether that right "was clearly established at time of [the] defendant's alleged misconduct." *Id.* at 232 (quotation marks omitted). A right is "clearly established" when its "contours [are] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018). A court may determine whether the right allegedly violated was "clearly established" before it determines whether the plaintiff adequately alleges a violation. *Pearson*, 555 U.S. at 236.

## IV

### A

Gibbs primarily alleges that Byard, Lucke, Jenkins, Verrecchio and Gaul violated his right under the Due Process Clause of the Fourteenth Amendment not to be convicted at a criminal trial in which the prosecution used fabricated evidence. (Compl. ¶¶ 115–20). Specifically, he contends that the detectives "fabricated evidence"

"by coercing false statements from" Thrones, Holmes and Andrews and that the
prosecution's case depended "entirely" on their statements.  (*Id.* ¶¶ 100, 116.)  To state
a claim for fabrication of evidence, Gibbs must allege that a defendant willfully,
knowingly, or recklessly formulated or submitted false evidence that was introduced at
trial.  *Mervilus v. Union County*, 73 F.4th 185, 193–95 (3d Cir. 2023).  A police officer
may formulate or submit false evidence by "coercing a false statement" from a witness.
*Dennis v. City of Philadelphia*, 19 F.4th 279, 284, 289 (3d Cir. 2021).  The plaintiff must
show, however, that the officer knew the coerced statement was false.  *Halsey v.
Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *Black v. Montgomery County*, 835 F.3d 358,
372 (3d Cir. 2016).

Gibbs has not adequately alleged that Byard, Lucke, Jenkins, Verrecchio or Gaul
fabricated evidence by coercing false statements from Thrones, Holmes and Andrews.
To begin, he fails to state that the detectives were personally involved in the alleged
fabrication of the statements by Thrones and Holmes.  He alleged that Dove and Burns
interviewed Thrones.  (Compl. ¶ 28.)  And he alleged that a "white" detective and Nordo
interviewed Holmes.  (*Id.* ¶¶ 43–53.)  Gibbs alleges no facts tying Byard, Lucke,
Jenkins, Verrecchio or Gaul to the statements made by Thrones or Holmes.[3]  Because
Gibbs fails to allege facts showing that the detectives "played a[ny] role" in the

---

[3]      In his brief opposing the detectives' motion, Gibbs asserts that "Byard" interviewed Holmes,
and proceeds to quote Paragraph 35 of his Complaint as stating:  "Holmes explained that he 'just
made-up stuff . . . because it's something that they wanted to hear' and '[t]hey just kept pestering me
about making up lies.'"  (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss at 3.)  Paragraph 35 of
Gibbs's Complaint, however, concerns not Holmes, but another witness Denise Jackson, and
Paragraph 35 does not contain any factual allegations that Byard pestered Holmes to make up lies.
Rather, Paragraph 35 states:  "Notes in the Homicide file indicate that Jackson was 'not interviewed'
during this time and that '[s]he literally screamed for an entire day that she didn't see anything.'"
(Compl. ¶ 35.)  The quote from Gibbs's brief is not in the Complaint.

statements made by Thrones or Holmes, he has not stated a plausible claim that they fabricated those statements. *Halsey*, 750 F.3d at 289 n.12.

Gibbs also fails to state a claim that the detectives fabricated evidence by coercing a false statement from Andrews. He does not allege facts supporting a plausible claim against Byard, Jenkins, Verrecchio or Gaul because he does not assert those detectives personally participated in the alleged formulation or submission of false evidence with respect to Andrews. He claims Nordo and Lucke interviewed Andrews, but nothing ties the other detectives to the statement made by Andrews. (Compl. ¶¶ 54–59.) Next, Gibbs fails to plead sufficient facts to show that Lucke fabricated evidence while he interviewed Andrews. Gibbs claims Andrews told Nordo and Lucke he did not see Gibbs shoot Alvin and Butler; that Andrews eventually signed a statement implicating Gibbs; and that Andrews signed the statement because he "got tired of" Nordo and Lucke "asking" him "about the crime scene," so he "just started to agree and stuff."[4] (*Id.* ¶¶ 56–58.) These allegations are "merely consistent with" a claim that Lucke fabricated evidence by coercing a false statement from Andrews. *Twombly*, 550 U.S. at 557. There is an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682 (quotation marks and citation omitted), for why Andrews implicated Gibbs: He "got tired" of Lucke asking him questions about Gibbs and the crime scene and

---

[4]     In his response to the detectives' motion, Gibbs quotes Paragraph 47 of his Complaint as stating "Detective Lucke testified that Derrick Andrews was taken up to the Homicide Unit by Nordo, and that Nordo was alone with Andrews and talking to him before Lucke joined the conversation" and that "Andrews 'wasn't happy and he was, you know, hesitant. But he did tell us what he told us.'" (Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss at 3.) Paragraph 47 of Gibbs's Complaint, however, is about Holmes, not Andrews, and reads: "Holmes was later questioned by Defendant Nordo, who 'kept on pressuring me, kept on pressuring me, kept on pressuring me' and said he knew Holmes knew that Plaintiff was the shooter, so 'he was like, 'C'mon, man, I just want to bring the Philly out of you, to tell the truth,' and like, he just kept on saying that I know who did it." (Compl. ¶ 47.) The Complaint never alleges that Lucke "testified" about Andrews.

wanted to go home.  (Compl. ¶¶ 56–58.)  No allegations permit the reasonable inference that Lucke knowingly coerced Andrews to falsely implicate Gibbs.  Without more, the Court may infer only "the mere possibility" that Lucke engaged in "misconduct."  *Iqbal*, 556 U.S. at 679.

B

Gibbs next asserts claims for malicious prosecution under the Fourth and Fourteenth Amendments.  (Compl. ¶¶ 110–14.)  The Court dismisses the Fourteenth Amendment claim on qualified-immunity grounds because there is no clearly established right against malicious prosecution under the Fourteenth Amendment, and no such right was clearly established during the period of the detectives' alleged misconduct, 2013.  *Handy v. City of Philadelphia*, No. 24-1905, 2024 WL 4309973, at *3 (E.D. Pa. Sept. 26, 2024); *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 382 (E.D. Pa. 2018); *Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 377 (E.D. Pa. 2023); *Alicea v. City of Philadelphia*, No. 22-3437, 2022 WL 17477143, at *4 (E.D. Pa. Dec. 6, 2022); *Lewis v. City of Philadelphia*, No. 19-2847, 2020 WL 1683451, at *7–8 (E.D. Pa. Apr. 6, 2020).

To state a claim for malicious prosecution under the Fourth Amendment, a plaintiff must allege that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceeding.  *Halsey*, 750 F.3d at 296–97.  A police officer may be liable for malicious prosecution if he

"influenced or participated in the decision" to initiate criminal proceedings.  *Id.* at 297; *Scheing*, 729 F. App'x at 179.  An officer may influence or participate in the decision to institute criminal proceedings by "furnish[ing] false information to . . . prosecuting authorities."  *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.2 (3d Cir. 1998) (quotation marks and citation omitted).

Gibbs largely ties his malicious prosecution claim to his fabrication of evidence claim.  He contends Byard, Lucke, Jenkins, Verrecchio and Gaul "initiated criminal proceedings against [him]" by "deliberately fabricating evidence . . . through the coercion of false witness statements." (Compl. ¶ 111.)  Gibbs does not allege facts supporting a plausible malicious prosecution claim because he does not adequately allege that the detectives fabricated evidence.  As explained in Part IV.A, *supra*, Gibbs does not allege facts from which the Court can infer that Byard, Lucke, Jenkins, Verrecchio or Gaul coerced Thrones, Holmes or Andrews to make false statements.  To the extent Gibbs premises his malicious prosecution claim on the allegations underlying the Johnson interview, that doesn't work either.  Gibbs alleged that Verrecchio and Gaul interviewed Johnson; that Johnson signed a statement implicating Gibbs; and that Johnson was not called to testify at Gibbs's trial.  (Compl. ¶ 66.)  These allegations do not permit an inference, let alone a reasonable inference, that Verrecchio and Gaul coerced Johnson to make a false statement or that the Johnson statement influenced the decision to institute criminal proceedings against Gibbs.[5]

---

[5]  Gibbs's state-law claim for malicious prosecution fails for similar reasons.  Under Pennsylvania law, Gibbs must allege that the detectives instituted criminal proceedings against him.  *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017).  Because Gibbs does not allege that the detectives influenced or participated in the decision to institute criminal proceedings, he cannot satisfy the first element of his claim under Pennsylvania law.

C

Gibbs next alleges that the detectives "failed to intervene" to prevent the "coercive interrogations of witnesses."  (*Id.* ¶¶ 128–29.)  Qualified immunity bars this claim.  Courts in this district have consistently held that there is no clearly established stand-alone right to intervention by officers to prevent malicious prosecution or deprivation of liberty without due process (fabrication of evidence), and no such right was clearly established during 2013.  *See Handy*, 2024 WL 4309973, at *6.

D

Gibbs next alleges that the detectives withheld evidence favorable to Gibbs in violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  A *Brady* violation has three elements: "(1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'"  *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).  Police officers can be liable for a *Brady* violation under § 1983 for failing to disclose exculpatory information to the prosecutor.  *Gibson v. Superintendent of N.J. Dep't of L. & Pub. Safety-Div. of State Police*, 411 F.3d 427, 443 (3d Cir. 2005).  This includes, for example, when officers "suppress[] the extent of their impermissible law enforcement tactics."  *Id.*; *see also Thorpe v. City of Philadelphia*, No. 19-5094, 2020 WL 5217396, at *13 (E.D. Pa. Sept. 1, 2020) (denying dismissal of *Brady* claim against officer who "failed to report that [a witness] did not identify [the defendant] in a photo array").  Gibbs fails to allege the detectives' personal involvement in any *Brady* violation because he does not identify any evidence favorable to him that they knew of but failed to disclose to the prosecution.  He claims the detectives collectively withheld

(relevant here) (1) "[e]vidence that Rhonda Alvin . . . had identified alternative suspects in the murders and had expressed her belief that [Gibbs] was not the shooter" and (2) "[e]vidence of initial statements by witnesses that they did not see the shooter." (Compl. ¶ 123.)  But Gibbs does not allege the names of the detective(s) who spoke with Rhonda Alvin.  *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) (explaining that in the § 1983 context the plaintiff must plead facts showing direct responsibility "by the named defendant").  And he pled no facts supporting that Byard, Lucke, Jenkins, Verrecchio or Gaul failed to provide the prosecution information regarding the initial statements by Thrones, Holmes and Andrews that they did not see the shooter.

E

Gibbs next asserts a claim for conspiracy to violate civil rights under Pennsylvania law.  To state a claim for civil conspiracy, Gibbs must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means."  *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979); *Reese v. Pook & Pook, LLC*, No. 14-5715, 2019 WL 13178512, at *1 n.2 (E.D. Pa. Jan. 23, 2019) (order).

Gibbs fails to allege facts that could establish that Byard, Jenkins, Lucke, Verrecchio or Gaul reached any "agreement," with each other or anyone else.  The Complaint includes only the conclusory assertions that the "Defendants acted in concert and conspiracy" and "shared the common objective of securing" Gibbs's "conviction by any means necessary."  (Compl. ¶¶ 154–55.)

13

F

Lastly, Gibbs alleges intentional infliction of emotional distress under Pennsylvania law.  (Compl. ¶¶ 149–52.)  To state such a claim, Gibbs must show the defendant intentionally or recklessly engaged in "extreme and outrageous" conduct which caused him severe emotional distress.  *Swisher v. Pitz*, 868 A.2d 1228, 1230–31 (Pa. Super. Ct. 2005) (quotation marks and citation omitted); *Clark v. Township of Falls*, 890 F.2d 611, 622–24 (3d Cir. 1989).  Gibbs alleges that Byard, Lucke, Jenkins, Verrecchio and Gaul intentionally inflicted extreme emotional distress by "fabricating evidence," *i.e.*, by "coercing witnesses to provide false statements implicating him in two murders."  (Compl. ¶ 150.)  This claim fails because, as explained, Gibbs has not alleged facts supporting a plausible fabrication claim against the detectives.[6]

V

A court should grant a plaintiff leave to amend a complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This rule expresses "a preference for liberally granting leave to amend" unless "amendment would cause undue delay or prejudice, or that amendment would be futile."  *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000).  Amendment is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).  The decision whether to grant or deny leave to amend is within the

---

[6]    Gibbs also suggests that the detectives intentionally inflicted emotional distress by "withholding exculpatory evidence."  (Compl. ¶ 150.)  He may be trying to tie his argument here to his *Brady* claim.  (*Id.* ¶¶ 121–26.)  For his *Brady* claim, he alleged that the detectives collectively withheld (relevant here) (1) "[e]vidence that Rhonda Alvin . . . had identified alternative suspects in the murders and had expressed her belief that [Gibbs] was not the shooter" and (2) "[e]vidence of initial statements by witnesses that they did not see the shooter."  (*Id.* ¶ 123.)  But Gibbs, as explained, fails to allege sufficient facts that the detectives committed *Brady* violations.

sound discretion of the district court. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001).

Granting leave to amend would not cause undue delay or prejudice, and the Court cannot say at this point that amendment would be futile. Gibbs may amend the claims dismissed without prejudice—the claims under federal and state law for fabrication of evidence, malicious prosecution, *Brady* violations, civil conspiracy and intentional infliction of emotional distress—if he can allege facts which could overcome the shortcomings identified in this Memorandum.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.


15